UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NATEXIS, LLC,

                            Plaintiff,

          -against-

NEW EAGLE HOLDINGS, LLC f/k/a
ARNHOLD AND S. BLEICHROEDER
HOLDINGS, INC.

                           Defendant.

09 Civ. 153 (RJH)

**MEMORANDUM OPINION
AND ORDER**

---

       In this action, plaintiff Natexis, LLC ("Natexis") has sued defendant New Eagle Holdings, LLC ("New Eagle") for a declaration of its obligations under a written agreement—the Value Protection Agreement ("VPA")—and New Eagle has counterclaimed for breach of that same agreement. Both parties now move for judgment on the pleadings. For the reasons given below, the Court finds in favor of plaintiff.

       The parties entered into the VPA as part of the acquisition of Arnhold and S. Bleichroeder, Inc. ("ASBI") by Natexis Banque Populaires ("NBP"). Pursuant to another agreement, called the Contribution Agreement, New Eagle's predecessor in interest, Arnhold and S. Bleichroeder Holdings, Inc., had agreed to transfer its ASBI shares to NBP in return for NBP shares. Because the Contribution Agreement also restricted defendant's ability to transfer the NBP shares immediately following the transaction, the parties entered into the VPA to provide defendant with protection against NBP price declines. The scope of this protection is the only issue in this case.

The parties' dispute focuses on Section 1.02(a) of the VPA. That section defines not the right to price protection itself—that is defined subsequently in Section 1.02(b)—but when and for which shares the right can be exercised. Specifically, Section 1.02(a) states that the provisions of Section 1.02(b) shall apply only to "Transfers" of:

> (a) up to a maximum of 10% of the Consideration Shares in the aggregate for Transfers occurring between the six-month anniversary of the Closing Date [of the acquisition] and the first anniversary of the Closing Date, (b) up to a maximum of 35% of the Consideration Shares in the aggregate (including all previous Transfers of Consideration Shares pursuant to Section 3.2(b) of the Contribution Agreement) for any Transfers occurring between the first anniversary of the Closing Date and prior to the second anniversary of the Closing Date, (c) up to a maximum of 45% of the Consideration Shares in the aggregate (including all previous Transfers of Consideration Shares pursuant to Section 3.2(b) and (c) of the Contribution Agreement) for any Transfers occurring between the second anniversary of the Closing Date and prior to the third anniversary of the Closing Date, [and] (d) up to a maximum of 55% of the Consideration Shares in the aggregate (including all previous Transfers of Consideration Shares pursuant to Section 3.2(b), (c), and (d) of the Contribution Agreement) for any Transfers occurring between the third anniversary of the Closing Date and prior to the seventh anniversary of the Closing Date . . . .

The section further provides that in the event of the death of a major shareholder of ASBI, defendant could receive price protection on an additional 7.5% at any time prior to the seventh anniversary of the Closing Date, provided that the shareholder died between the Closing Date and the fifth anniversary of the Closing Date. The parties agree that defendant had a base of 13,955,800 Consideration Shares, and that one major shareholder did die prior to the fifth anniversary of the Closing Date, leaving the maximum number of shares for which plaintiff could be liable for protection at 62.5%.

It is only after these parameters are delineated that the VPA defines the price protection right in section 1.02(b). In that section, which is expressly "[s]ubject to Section 1.02(a)", the VPA grants defendant the right to request compensation for share

2

transfers when it receives "a value per Consideration Share less than Closing Per Share Price", where the "Closing Per Share Price" is simply a price fixed on the Closing Date. In subsequent sections, the VPA requires plaintiffs to honor these requests for compensation of under certain other conditions not at issue here.

Between the Closing Date and the fifth anniversary of the Closing Date, defendant sold 5,451,260 Consideration Shares, or approximately 39% of its shares, at prices above the Closing Per Share Price, and never sought protection under the VPA. Subsequently, defendant sold an additional 8,250,000 shares, or 59.1% of its total, for prices below the Closing Per Share Price, and sought protection under the VPA. Plaintiff reached an agreement with defendant to pay price protection on 3,271,120 of the 8,250,000 shares, claiming that the initial 5,451,260 shares sold counted towards the maximum number of shares eligible for value protection. When the 3,271,120 shares are added to the previously sold 5,451,260, they yield 8,722,380, or 62.5%, the maximum for which plaintiff could be liable for protection. Defendant argues that the 5,451,260 should not count towards the 62.5% maximum, and because 8,250,000 shares is less than 62.5%, it should receive protection for all of these shares.

"Judgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). In deciding a motion for judgment on the pleadings, courts may consider, in addition to allegations in the complaint itself, "documents attached to the complaint as an exhibit or incorporated in it by reference" provided that plaintiff relied "on the terms and effect of [the] document in drafting the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d

3

147, 153 (2d Cir. 2002); *see also Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (courts apply the same standard to motions under 12(c) as they do to motions under 12(b)(6)). Here, the parties do not dispute that plaintiff incorporated the Contribution Agreement and the VPA into its complaint and that plaintiff relies on them for its claim. Accordingly, the Court considers the pleadings and these two agreements in deciding the motions before it.

A court may enforce a contract as a matter of law provided that the contractual language at issue is unambiguous on its face. *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002). "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield*, 98 N.Y.2d at 569 (quotations and citations omitted). In determining ambiguity, courts should consider the contract as a whole and not merely the particular phrase whose meaning is disputed by the parties. *See Hudson-Port Ewen Associates, L.P. v. Chien Kuo*, 78 N.Y.2d 944, 945 (1991) ("Where consideration of a contract as a whole resolves the ambiguity created by one clause, there is no occasion to consider extrinsic evidence of the parties' intent.").

The issue the parties ask the Court to resolve is whether Section 1.02(a) of the VPA requires the parties to count towards the 62.5% maximum for value protection the 5,451,260 shares defendant sold at prices above the Closing Per Share Price. If the Court

4

determines that the plain meaning of Section 1.02(a) is to so require, the Court must grant plaintiff's motion. If the plain meaning of Section 1.02(a) is to require the parties to count towards the 62.5% maximum only those shares sold below the Closing Per Share Price, the Court must grant defendant's motion. Of course, if the Court concludes that Section 1.02(a) is ambiguous, i.e., both parties have a reasonable basis for their interpretations, the Court must deny both motions.

It is undisputed that the Consideration Agreement and the VPA are merely parts of a single agreement, and the Court finds recourse to the former essential to interpreting the latter. First, and perhaps most obviously, the term "Transfer" used in Section 1.02(a) is defined in Section 3.1 of the Contribution Agreement as "to sell, assign, pledge, engage in any type of hedging or derivative transaction . . . with respect to, or transfer, voluntarily, involuntarily or by operation of law . . . any Consideration Shares or interest therein." Second, as the parties both note, the language in Section 1.02(a) of the VPA tracks the language in Section 3.2 of the Contribution Agreement. Section 3.2(b) provides that "[a]fter the six-month anniversary of the Closing Date and prior to the first anniversary of the Closing Date, [New Eagle] shall be entitled to Transfer in the aggregate up to a number of Consideration Shares equal to 10% of the Consideration Shares." Section 3.2(c) provides that "[a]fter the first anniversary of the Closing Date and prior to the second anniversary of the Closing Date, [New Eagle] shall be entitled to Transfer in the aggregate (including all previous Transfers of Consideration Shares pursuant to clause (b) of this Section) up to a number of Consideration Shares equal to 35% of the Consideration Shares." Sections 3.2(d) and 3.2(e) contain similar language restricting defendant from transferring more than 45% of the Consideration Shares

5

between the second and third anniversaries, and more than 55% of the Consideration Shares between the third and fifth anniversaries.  The Court agrees with the parties that the phrase "in the aggregate" followed by the parenthetical referencing previous transfers was intended to reflect the cumulative nature of the maximum set for each time period. In other words, if defendant had sold 10% of the shares in the first time period, it was not entitled to sell an additional 35% in the second time period, but only another 25%.  If, of course, defendant had sold no shares in the first time period, it could sell the full 35% in the second time period, but the clear meaning of the text is that previous sales should count towards the maximum allowable transfers set in each period.

Given how the phrase "in the aggregate" and its trailing parenthetical are used in the Contribution Agreement, the Court concludes that the plain meaning of the same phrase and parenthetical as used in section 1.02(a) of the VPA supports plaintiff's interpretation.  In the Contribution Agreement, the phrase and parenthetical are used to calculate the maximum number of shares defendant can transfer, explaining that transfers from prior periods should count towards the calculation of the maximum in the current period.  The same can be said of the phrase and parenthetical as used in the VPA.  In calculating the maximum number of shares available for price protection, transfers from prior periods should count towards the calculation of the maximum in the current period. The Court notes that the parenthetical does not read "all previous *below market* Transfers" but "all previous Transfers".  Furthermore, the word "Transfers" is defined in the Contribution Agreement to incorporate all sales of NBP stock, not merely those that are below market.  Hence, if in the first period, defendant sold 5% of its shares, those

6

shares count towards the maximum 35% in the second period regardless of whether they were below market or not.

In attempting to escape this conclusion, defendant makes four arguments—all of which fail.  First, defendant argues that this interpretation impermissibly reads the word "first" into the contract, as in "the first 35%" of transferred shares count towards the maximum, rather than simply transfers submitted for price protection.  The Court is not, however, adding words but merely interpreting words that are already there—i.e., the phrase "in the aggregate" and its trailing parenthetical.  As plaintiff argues, if anything it is defendant who is adding words by implicitly arguing that the words "below market" are contained in the parenthetical.

Second, defendant argues that because the phrase "in the aggregate" and its trailing parenthetical do not qualify the 7.5% subject to value protection if a major shareholder dies, the Court's interpretation cannot apply to that 7.5% and shouldn't apply elsewhere because the interpretation should be uniform for all transfers.  But no reading of the clause concerning this additional 7.5% would require adding the phrase "in the aggregate", and its absence does not raise the inference defendant seeks.  Because the language concerning the additional 7.5% is triggered anytime a major shareholder dies before the fifth anniversary of the Closing Date—including the first six months when no transfers are possible—it would make no sense to talk about previous transfers because there might not be any.  Furthermore, section 1.02(a) makes clear that even if both major shareholders die and an additional 15% of the shares are eligible for price protection, price protection will apply to "no more than 70% of the Consideration Shares in the

7

aggregate". Using the "in the aggregate" language again suggests that all transfers count towards the calculation of this maximum.[1]

Third, defendant argues that the Court's interpretation actually conflicts with, rather than supports, the Contribution Agreement. In its only attempt to explain the "in the aggregate" language, defendant argues that this language as found in the VPA should be interpreted similarly to the same language as found in the Contribution Agreement:

> As in the Contribution Agreement, to ensure that the percentage limitations are not simply added from one period to the next, the parties used the same 'in the aggregate' language and subsequent parenthetical. However, because the percentage limitations in this section apply to Below Market Transfers as to which value protect[ion] might be claimed, and not to all transfers, the 'in the aggregate' language and subsequent parenthetical requires inclusion of only those prior transfers that qualify as Below Market Transfers as to which value protection was claimed.

Def. Br. at 18. The Court is at a loss for how its interpretation of the "in the aggregate" language in the VPA is less "similar" to the same language in the Contribution Agreement. If anything, it is defendant's interpretation of the VPA that departs significantly from the Contribution Agreement, insisting that "in the aggregate" in the VPA applies only to below market transfers rather than all transfers as in the Contribution Agreement. There is nothing in the two agreements to support this divergent reading of the contested phrase, and the structure of the VPA actually refutes it. Section 1.02(a) of the VPA defines the parameters of the price protection right before Section 1.02(b)

---

[1] At oral argument, defendant relied heavily on a hypothetical in footnote 3 of its brief. This hypothetical assumes that, immediately before the fifth anniversary of the Closing Date, a major shareholder dies and New Eagle sells 55% of the consideration shares for a profit. Applying the Court's interpretation of the VPA to this hypothetical, if New Eagle sold 7.5% of its shares at a profit immediately following the fifth anniversary, and then sold an additional 7.5% of its share at a loss the following day, New Eagle could not seek value protection on the second 7.5%. Defendant argued that this contradicted the plain language of the VPA because no "in the aggregate" clause modified the 7.5% grant of value protection. Again, because the phrase "in the aggregate" modifies the maximum available for value protection, including the 15% available for deaths of the major shareholders, there is nothing contradictory in the Court's interpretation.

8

defines the right itself. The natural reading of 1.02(a) is to read it as independent of, and analytically prior to, 1.02(b). Only after calculating the maximums can the parties conclude what right the defendant possesses within those maximums. Accordingly, the Court's interpretation is consistent with both the structure of the VPA and the Contribution Agreement, while defendant's is consistent with neither.

Fourth and finally, defendant argues that the Court's reading would undermine the purpose of the VPA to protect it from loss when its transfers were restricted and to induce it to enter into the Contribution Agreement. But defendant did get price protection during the first five years following the closing, the only years in which transfers were restricted. The fact that price protection extends for seven years ensures that defendant was not prejudiced by choosing not to sell the maximum number of shares it could in those first five years. This is a valued, bargained-for consideration. It would be improper for the Court to grant defendant a further benefit that was not bargained for when doing so requires an interpretation that conflicts with the plain language of the contract.

For the reasons stated, the Court finds that plaintiff had fulfilled its obligations under the VPA and has no further liability for value protection. Accordingly, plaintiff's motion [9] is GRANTED and defendant's motion [12] is DENIED. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
August 7, 2009

Richard J. Holwell
United States District Judge

9

defines the right itself. The natural reading of 1.02(a) is to read it as independent of, and analytically prior to, 1.02(b). Only after calculating the maximums can the parties conclude what right the defendant possesses within those maximums. Accordingly, the Court's interpretation is consistent with both the structure of the VPA and the Contribution Agreement, while defendant's is consistent with neither.

Fourth and finally, defendant argues that the Court's reading would undermine the purpose of the VPA to protect it from loss when its transfers were restricted and to induce it to enter into the Contribution Agreement. But defendant did get price protection during the first five years following the closing, the only years in which transfers were restricted. The fact that price protection extends for seven years ensures that defendant was not prejudiced by choosing not to sell the maximum number of shares it could in those first five years. This is a valued, bargained-for consideration. It would be improper for the Court to grant defendant a further benefit that was not bargained for when doing so requires an interpretation that conflicts with the plain language of the contract.

For the reasons stated, the Court finds that plaintiff had fulfilled its obligations under the VPA and has no further liability for value protection. Accordingly, plaintiff's motion [9] is GRANTED and defendant's motion [12] is DENIED. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
August 7, 2009

Richard J. Holwell
United States District Judge